UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PETRO-MARINE UNDERWRITERS, INC. ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 2:17-cv-09955** |
| **COX OPERATING, LLC, ET AL.** | **SECTION: T(2)** |

## ORDER

Before this Court are two Motions for Summary Judgment. Cox Operating, L.L.C. and Cox Oil Offshore, L.L.C. ("Cox Entities" or "Defendants") filed a Rule 56 Motion for Summary Judgment against Petro-Marine Underwriters, Inc. and Delta Energy Management and Consultants, L.L.C. ("Petro-Marine" or "Plaintiffs"), entitled "Motion for Summary Judgment on Plaitniffs' Claims and, in the alternative, Motion for Summary Judgment on Defendants' Defense of Error .[1] Additionally, Plaintiffs filed a Rule 56 Motion for Partial Summary Judgment against Defendants on the issue of liability.[2] For the following reasons, Defendants' Motion for Summary Judgment[3] is **DENIED**, and Plaintiffs' Motion for Partial Summary Judgment[4] is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Petro-Marine Underwriters, Inc., provides surety bond broker services,[5] while Plaintiff Delta Energy Management Consultants, LLC, provides consulting services.[6] Defendants,

---

[1] R. Doc. 57.
[2] R. Doc. 59.
[3] R. Doc. 57.
[4] R. Doc. 59.
[5] R. Doc. 57-1, pp.3-4.
[6] R. Doc. 57-1, p.4.

1

the Cox Entities, are engaged in oil and gas exploration and production.[7] This breach of contract dispute arises out of an arrangement between Plaintiffs and Defendants for the payment of bond commissions to Plaintiffs in exchange for consulting services they provided and would provide in assisting the Defendants with the acquisition of certain assets from Chevron USA, Inc. ("Chevron") located in the Gulf of Mexico and the placement of any supplemental bonding.[8] Plaintiffs assert Defendants failed to designate Petro-Marine as a co-broker on the surety bonds so that Plaintiffs would be paid the contracted-for commission payments and, therefore, breached the agreement between them.[9] Defendants filed a counterclaim asserting Plaintiffs did not perform, or did not adequately perform, the services contemplated between the parties and therefore have breached the agreement such that no amounts are owed.[10]

According to the pleadings, Defendants engaged Plaintiffs to provide consulting services regarding financial responsibility requirements relating to assets Defendants sought to acquire from Chevron in its 2015 offering ("Cox-Chevron transaction").[11] Before the parties executed a contract, Plaintiffs performed work for Defendants by writing reports to Defendants and attending meetings on Defendants' behalf in Louisiana and Texas.[12] On August 27, 2015, Plaintiffs provided Defendants with a proposed contract that included compensation for work performed.[13] Defendants, however, did not enter into this contract.[14] Thereafter, Defendants conferred with their insurance broker, McGriff, Seibels, & Williams, Inc. ("McGriff"), about compensating Plaintiffs

---

[7] R. Doc. 57-1, p.3.
[8] R. Doc. 1.
[9] *Id*.
[10] R. Doc. 10.
[11] R. Doc. 57-1, p.3; R. Doc. 59-6, p.1.
[12] *Id*.
[13] R. Doc. 57-1, p.4.
[14] *Id*.

for their services on the Cox-Chevron transaction.[15] McGriff, via email dated September 3, 2015, informed Defendants that McGriff would be willing to share commissions with Plaintiffs.[16]

On September 9, 2015, the Defendants executed an agreement with Plaintiffs via email ("Email Agreement").[17] Subsequently, the parties formalized their Email Agreement in another agreement ("Letter Agreement").[18] The parties entered into the Letter Agreement a few weeks after the Email Agreement and back-dated it to September 9, 2015.[19] The Email Agreement detailed the sharing of commissions between Plaintiffs and McGriff.[20] The Letter Agreement detailed the sharing of commissions between Plaintiffs and the "Broker or Agent actually acquiring such surety on behalf of Cox."[21] McGriff was ultimately the broker that acquired the surety on Cox's behalf.[22] Further, the Letter Agreement provided that "Petro-Marine Underwriters, Inc. will be made co-broker on all bonds placed on properties purchased from Chevron and is entitled to the above referenced commission structure as long as a Cox-related entity has an any [sic] interest in these properties."[23]

In the fall of 2015, oil prices dropped; the future of the Cox-Chevron transaction looked dubious.[24] Defendants notified Plaintiffs of the transaction's uncertainty and advised Plaintiffs that they could invoice Defendants for their performed work.[25]

---

[15] *Id*.
[16] *Id*.
[17] R. Doc. 59-6, p.1.
[18] R. Doc. 59-6, p.2.
[19] R. Doc. 57-1, p.6; R. Doc. 59-6, p.2.
[20] R. Doc. 57-2, Ex. A-6.
[21] R. Doc. 57-2, Ex. A-9.
[22] R. 57-1, p.7.
[23] R. Doc. 57-2, Ex. A-9.
[24] R. Doc. 57-1, p.6.
[25] *Id*.

On December 9, 2015, Defendants, Chevron, and Union Oil Company of California ("Union Oil") entered into an Asset Sale and Purchase Agreement ("ASPA"), which transferred assets to Defendants.[26] The ASPA required Defendants to place a $48 million performance bond.[27] The deal closed on April 15, 2016.[28] Due to regulation of all offshore operators with the Bureau of Ocean Energy Management ("BOEM"), Defendants placed two additional bonds: a $3 million operator's bond and a $300,000 right-of-way bond.[29] Defendants acquired all three bonds through Aspen American Insurance Company ("Aspen"), a bond surety company.[30] Each of the bonds was issued effective April 15, 2016.[31] McGriff solely brokered all three bonds.[32]

In mid-2017, after learning of the bond placements, Plaintiffs sent a letter to Defendants, demanding commissions from the bond placements.[33] Defendants responded by letter, denying an obligation to pay commissions to Plaintiffs, noting that the bonds were not obtained through Plaintiffs' efforts.[34] Also, in the letter, Defendants terminated the Letter Agreement.

In response, Plaintiffs filed this suit alleging breach of contract.[35] Defendants filed a motion for summary judgment asserting that (1) Plaintiffs' breach of contract claim fails because the Email Agreement and Letter Agreement provide that a surety, not Defendants, shall pay the commissions; (2) Plaintiffs are not entitled to the commissions because Plaintiffs were not the procuring cause of the bonds; and (3) in the alternative, the Letter Agreement should be rescinded because error

---

[26] R. Doc. 57-1, p.7.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*; R. Doc. 59-5, p.7.
[31] R. Doc. 57-1, p.7.
[32] *Id.*; R. Doc. 59-5, p.7.
[33] R. Doc. 57-2, Ex. A-15.
[34] R. Doc. 57-2, Ex. A-16.
[35] R. Doc. 1.

4

concerning the Agreement's cause vitiated Defendants' consent.[36] Plaintiffs filed an opposition to Defendants' motion for summary judgment.[37] With leave of court, Defendants filed a reply to Plaintiffs' opposition.[38]

Additionally, Plaintiffs filed a motion for partial summary judgment.[39] Plaintiffs contend that (1) the Letter Agreement required a surety company to compensate Plaintiffs for the already completed work, but (2) because Defendants did not designate Petro-Marine Underwriters, Inc. as co-broker on all bonds placed on properties purchased from Chevron, the surety company did not compensate Plaintiffs.[40] Defendants filed an opposition to Plaintiffs' motion for partial summary judgment.[41] With leave of court, Plaintiffs filed a reply to Defendants' opposition.[42]

## LAW AND ARGUMENT

### I. Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[43] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[44] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to

---

[36] R. Doc. 57-1.
[37] R. Doc. 66.
[38] R. Doc. 84.
[39] R. Doc. 59.
[40] R. Doc. 59-1.
[41] R. Doc. 69.
[42] R. Doc. 76.
[43] Fed. R. Civ. P. 56(a).
[44] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

5

either support or defeat a motion for summary judgment."[45] The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.[46] "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial."[47]

### A. Contract Interpretation

A federal court sitting in diversity must apply the substantive law of the state in which it sits.[48] Under Louisiana law, the interpretation of a contract is a question of law for the court.[49] "Interpretation of a contract is a determination of the common intent of the parties."[50] "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[51] Additionally, a provision is unambiguous "where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight."[52]

Here, there is no dispute that this Court has diversity jurisdiction over this lawsuit; therefore, Louisiana law applies to this breach of contract claim.

The parties do not dispute (1) that "the surety company" was to pay the commissions (splitting the commissions between Plaintiffs and McGriff) and (2) that Plaintiffs, prior to the

---

[45] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).
[46] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).
[47] *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016).
[48] *Phillips v. Correct Care Sols., Inc*, No. CV 16-16551, 2017 WL 367663, at *3 (E.D. La. Jan. 25, 2017) (citing *Erie v. Tompkins*, 304 U.S. 64, 71-77 (1938)).
[49] *Tulane Hotel Inv'rs Corp. v. First Fin. Bank, F.S.B.*, No. CIV. A. 84-6127, 1987 WL 15651, at *3 (E.D. La. Aug. 7, 1987) (citing *Chevron U.S.A., Inc. v. Belco Petroleum Corp.,* 755 F.2d 1151, 1153, *reh. denied,* 761 F.2d 695 (5th Cir.), *cert. denied,* 106 S. Ct. 140, 88 L.Ed.2d 116 (1985)).
[50] La. Civ. Code art. 2045.
[51] La. Civ. Code art. 2046.
[52] *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (citing *Lloyds of London v. Transcontinental Gas Pipe Line Corp.,* 101 F.3d 425, 429 (5th Cir. 1996); *Rutgers, State Univ. v. Martin Woodlands Gas Co.*, 974 F.2d 659, 662 (5th Cir. 1992)).

execution of the Letter Agreement, had already performed services for Defendants.[53] However, the parties dispute whether the procuring cause doctrine applies here and whether Defendants had an affirmative duty to designate Petro-Marine as a co-broker on the bonds at issue. For the reasons set forth below, this Court finds no ambiguity in the contested provisions of the Letter Agreement. The Court further finds that the procuring cause doctrine does not apply and that Defendants had an affirmative duty under the Letter Agreement to designate Petro-Marine as a co-broker on the bonds at issue.

First, the Court finds the procuring cause doctrine does not apply under the facts of this case. Plaintiffs assert they were not required to be the ultimate broker to be compensated. Plaintiffs contend the Letter Agreement merely provides the "payment mechanism" to compensate Plaintiffs for past and potential future services, and for these reasons, the Letter Agreement is not a broker agreement and thus the procuring cause doctrine does not apply. Defendants counter that the Letter Agreement is a broker agreement, and, because the agreement is non-exclusive, the procuring cause doctrine applies. Plaintiffs have the better argument under the facts of this case.

The Letter Agreement states in pertinent part:

> In accordance with our [Email] Agreement dated September 9, 2015 between [Cox Entities and Petro-Marine], the parties have agreed to the following: Delta and Petro **have already provided, and may continue to provide**, certain consulting services to Cox with regard to the acquisition of Chevron assets and on regulatory issues regarding financial assurances to the federal government and oil and gas.
>
> **Compensation due Delta and/or Petro for these services shall be due and payable on the initial placement and any subsequent renewals of any surety bonding placed** on behalf of any Cox entity which resulted from the acquisition by Cox of interests in certain assets of Chevron in the Gulf of Mexico in Chevron's 2015 offering, **regardless of the brokers or agents involved**, for as long as Cox owns any interest in those assets. This compensation is due at the initial placement of any such security whenever that individual event occurs, it being recognized that the assets may likely be bonded over a period of time. At the time

---

[53] R. Doc. 69, pp.8-10; R. Doc. 84, pp.2-3.

7

of an initial placement of any surety relating to the Chevron assets to be acquired on behalf of any Cox entity, Petro-Marine shall receive 65% of the standard commission for the Bond (by the surety company) with the remaining 35% going to the Broker or Agent actually acquiring such surety on behalf of Cox. All reasonable expenses incurred by Delta and Petro, such as requested travel, etc., will be reimbursed by Cox.

**Regarding all surety renewals**, the split for all compensation received, either as commissions or for service or management fees, **split of compensation will be reversed with 65% of all compensation, service fees or gross income received from renewals going to the placing Broker or Agency (or to their interest) and the remaining 35% paid to Petro.** All compensation to Petro must be paid within 14 days of payment by Cox or its interests.

**It is further agreed that Petro-Marine Underwriters, Inc., will be made co-broker on all bonds placed on properties purchased from Chevron and is entitled to the above referenced commission structure as long as a Cox related entity has an any [sic] interest in these properties.** Petro-Marine Underwriters, Inc. will be entitled to full access to of all [sic] Cox documents relating to the properties bonded including all financial information concerning bonds, premium paid, consulting fees, monthly bonding accounts, commissions, management, or service fees on those bonds whether in possession of Cox, its Brokers or Agents, its sureties, or regulatory agencies.[54]

The Court finds this Letter Agreement to be clear and unambiguous in that it specifically does not obligate the Plaintiffs to be the sole or procuring brokers on the bonds at issue to be compensated by the surety company. The agreement provides that Plaintiffs will be compensated for services that Plaintiffs "have already provided, and may continue to provide…."[55] The "already provided" provision reasonably encompasses services Plaintiffs previously performed on behalf of Defendants, whereas, the "may continue to provide" provision contemplates the performance of future services, but it does not obligate Plaintiffs to perform such future services to be compensated. Furthermore, the Letter Agreement specifies that Plaintiffs shall be compensated, "….upon the initial placement and any subsequent renewals of any surety bonding placed on behalf of any Cox entity … regardless of the brokers or agents involved, for as long as Cox owns any

---

[54] R. Doc. 57-2, Ex. A-9 (emphasis added); R. Doc. 59-7.
[55] *Id*.

interest in those assets."[56] Thus, the Letter Agreement provides for a 65-35 reciprocal commission sharing scheme upon initial placement of the surety bonds and a reversed commission sharing scheme, 35-65, for renewal of the bonds, regardless whether Petro-Marine is a placing broker or agent. Differentiating between Petro and the "placing Broker or Agency" and compensating Plaintiffs "regardless of the brokers or agents," the parties clearly intended for Plaintiffs, whether or not the actual broker or agency on the Cox-Chevron transaction, to be compensated. As a result, the Court finds the Letter Agreement is a contract between Cox and Petro-Marine, rather than a broker agreement, and, therefore, the procuring cause doctrine, by the contract's own terms, is not applicable.

The Court next finds that Defendants had an affirmative duty to designate Petro-Marine as a co-broker on the bonds at issue. The Letter Agreement unambiguously states that "Petro-Marine Underwriters, Inc. **will be made co-broker** on all bonds placed on properties purchased from Chevron and is entitled to the above referenced commission structure as long as a Cox related entity has an any [sic] interest in these properties."[57] The parties put forth two interpretations of this provision: (1) the provision requires Defendants to designate Petro-Marine as a co-broker, providing the "payment mechanism" for Plaintiffs' services[58] or (2) the provision does not require Defendants to designate Petro-Marine as a co-broker.[59] Plaintiffs contend that, if the provision does not place an affirmative duty on Defendants to designate Petro-Marine as a co-broker, then

---

[56] R. Doc. 57-2, Ex. A-9.
[57] *Id*.
[58] R. Doc. 59-5, p.13-14; R. Doc. 76, p.4; R. Doc. 66-3, p.8-10.
[59] R. Doc. 69, p.10-13; R. Doc. 84, p.3-4.

Defendants have no obligations under the Letter Agreement.[60] Whereas, Defendants assert that the provision does not obligate either party to designate Petro-Marine as a co-broker.[61]

Under Plaintiffs' interpretation, the Letter Agreement obligates Defendants to designate Petro-Marine as a co-broker providing for the "payment mechanism" for Plaintiffs' services. This is certainly reasonable because the Letter Agreement sets forth the commission-sharing structure to compensate Plaintiffs for "already provided" and potential future services.

Under Defendants' interpretation, the Letter Agreement obligates no one to designate Petro-Marine as a co-broker on the bonds at issue. If so, the Court can only question why the agreement would include such a provision? Also, how is the surety company, as detailed in the Letter Agreement, to compensate Plaintiffs if no party is obligated to designate Plaintiffs as a co-broker? Defendants' proposed interpretation cuts squarely against the Letter Agreement's stated purpose of compensating Plaintiffs for "already provided" and potential future services.

Because only one of the competing interpretations is reasonable, the Court finds the provision at issue to be unambiguous.[62] The Court thus finds that the Letter Agreement obligated Defendants to designate Petro-Marine as a co-broker on the bonds at issue so that Plaintiffs could be compensated according to the agreement. Because Defendants did not designate Petro-Marine as a co-broker on the bonds at issue, and Plaintiffs were not compensated pursuant to the Letter Agreement, the Court must conclude Defendants breached their obligations under the Letter Agreement.

---

[60] R. Doc. 76, pp.3-4.
[61] R. Doc. 84, p.4; R. Doc. 69-4, p.11.
[62] *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998) (citing *Lloyds of London v. Transcontinental Gas Pipe Line Corp.,* 101 F.3d 425, 429 (5th Cir. 1996); *Rutgers, State Univ. v. Martin Woodlands Gas Co.*, 974 F.2d 659, 662 (5th Cir. 1992)).

## B. Defenses of Error

Defendants alternatively assert they are entitled to summary judgment based on the affirmative defense of error. Specifically, Defendants contend they unilaterally erred on who would pay Plaintiffs' commissions and the parties bilaterally erred on who would designate Petro-Marine a co-broker.

Under Louisiana law, a party's consent "may be vitiated by error, fraud, or duress".[63] If error vitiates a party's contractual consent, the contract may be rescinded.[64] Error can be unilateral or bilateral.[65] Bilateral error occurs when both parties misunderstand each other at the time of contracting.[66] Specifically, bilateral error vitiates consent only when the bilateral error "concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party."[67] Cause is the reason why a party binds himself.[68] Further, error as to a cause occurs

> when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation.[69]

Bilateral error is a factual, not legal, determination.[70]

First, this Court finds no merit in Defendants' contention that Plaintiffs interpret the Letter Agreement to require Defendants to pay Plaintiffs' commissions. As previously noted, the parties

---

[63] La. Civ. Code art. 1948.
[64] *Chalos & Co., P.C. v. Marine Managers, Ltd.*, No. CIV. A. 14-2441, 2015 WL 6442558, at *7 (E.D. La. Oct. 23, 2015) (citing *Cyprien v. Bd. of Supervisors ex rel. Univ. of La.,* 5 So. 3d 862, 868 (La. 2009)).
[65] La. Civ. Code art. 1949, cmt. (d).
[66] La. Civ. Code art. 1949 (citing *Lyons Milling Co. v. Cusimano*, 161 La. 198, 108 So. 414 (1926)).
[67] La. Civ. Code art. 1949.
[68] La. Civ. Code art. 1967.
[69] La. Civ. Code art. 1950.
[70] *Spencer Franchise Servs. of Georgia, Inc. v. Wow Cafe & Wingery Franchising Account, L.L.C.*, 624 F. App'x 842, 845 (5th Cir. 2015) (citing *Peironnet v. Matador Res. Co.*, 144 So. 3d 791, 809 (La. 2013) ("[W]e must review the record evidence and determine if the jury erred in its factual conclusions regarding mutual error.")).

agree the Letter Agreement provided for the surety company to pay Plaintiffs' commissions.[71] Plaintiffs merely seek damages for breach of contract.[72] Therefore, Defendants' defense of unilateral error as to who would pay Plaintiffs' commissions is unfounded.

Second, Defendants have offered no competent summary judgment evidence that the parties intended for a party other than Defendants to designate Petro-Marine as a co-broker on the surety bonds at issue. Instead, Plaintiffs have produced competent summary judgment evidence to support their burden of proving that the parties intended for Defendants, and only Defendants, to designate Petro-Marine as a co-broker on the bonds at issue.[73] The Court can discern no genuine factual dispute as to whether the parties intended for someone other than Defendants to designate Petro-Marine as a co-broker on the surety bonds in order to be compensated pursuant to the agreement. The Court thus finds Defendants' defense of bilateral error is also unfounded.

### C. Bad Faith

Under Louisiana law, "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation."[74] "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived."[75] "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made."[76] "An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation."[77] Bad faith "generally implies

---

[71] R. Doc. 57-1, p.10; R. Doc. 66-3, p.20.
[72] R. Doc. 59-5, p.2.
[73] Scott Sewell Dep. 116:3-6, May 15, 2019 (Plaintiffs' owner and chairman testified that "[a broker of record letter is] up to Cox to provide"); Craig Sanders Dep. 183:16-18, June 20, 2019 (Defendants provided McGriff with a broker of record letter (placing McGriff as a broker)); R. Doc. 57-2, Ex. A-3 (McGriff's Senior Vice President expressed to Defendants that McGriff did not want Petro-Marine to be placed as a co-broker).
[74] La. Civ. Code art. 1994.
[75] La. Civ. Code art. 1995.
[76] La. Civ. Code art. 1996.
[77] La. Civ. Code art. 1997 cmt. (b).

actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties."[78] If an obligor breaches a contract in bad faith, the obligor is liable "for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."[79] Determining whether a party breached a contract in bad faith is a factual inquiry.[80]

Plaintiffs contend Defendants breached the Letter Agreement in bad faith. Plaintiffs point to statements made by Craig Sanders and Rodney Dykes, Defendants' CEO.[81] Mr. Sanders testified that he took "Zero" steps to figure out how Plaintiffs would get paid.[82] Mr. Dykes testified that if Plaintiffs had been "made co-broker or agent, then the bonding company would have paid commissions to them and they would have been compensated."[83]

On the other hand, Defendants submit they did not act in bad faith. Supporting this assertion, Defendants point to Mr. Dykes's meeting with Scott Sewell and Keith Vincent.[84] In this meeting, Mr. Dykes notified Defendants that the Cox-Chevron transaction remained uncertain and that Plaintiffs could invoice Defendants for their work performed.[85] Also, Defendants maintain they did not have a legal obligation to meet with and notify Plaintiffs.[86] Because there is a factual dispute as to whether Defendants breached the agreement in bad faith, Plaintiffs' motion for partial

---

[78] *Whitney Bank v. SMI Companies Glob., Inc.*, No. 18-31189, 2020 WL 525566, at *10 (5th Cir. Feb. 3, 2020) (citing *Delaney v. Whitney Nat'l Bank*, 1996-2144 (La. App. 4 Cir. 11/12/97), 703 So. 2d 709, 718).
[79] La. Civ. Code art. 1997.
[80] *Volentine v. Raeford Farms of Louisiana, LLC*, 50,698 (La. App. 2 Cir. 8/15/16), 201 So. 3d 325, 342, *writ denied*, 2016-1924 (La. 12/16/16), 212 So. 3d 1171, and *writ denied*, 2016-1925 (La. 12/16/16), 212 So. 3d 1171 (citing *N-Y Associates, Inc. v. Board of Com'rs of Orleans Parish Levee Dist.*, 2004-1598 (La. App. 4th Cir.2/22/06), 926 So. 2d 20, *writ denied*, 06–0666 (La. 5/26/06), 930 So. 2d 31; *Weeks v. T.L. James & Co.*, 626 So. 2d 420 (La. App. 3d Cir.1993), *writ denied*, 630 So.2d 794 (La.1994). *Cf. Miller v. Conagra, Inc.*, 08–0021 (La. 9/8/08), 991 So. 2d 445).
[81] R. Doc. 59-5, pp.15-16.
[82] *Id.*; R. Doc. 59-7, Ex. E, pp.184-86.
[83] R. Doc. 59-5, pp.15-16; R. Doc. 59-7, Ex. C, p.156.
[84] R. Doc. 69-4, p.16.
[85] *Id.*; R. Doc. 57-2, Ex. C, pp.159-161.
[86] R. Doc. 69-4, p.16.

summary judgment concerning Defendants' bad faith is not warranted under the summary judgment standard.

## CONCLUSION

For the reasons set forth above, the Court finds Defendants are not entitled to summary judgment as a matter of law, and thus Defendants' Motion for Summary Judgment[87] is **DENIED.** The Court further finds that Plaintiffs are entitled to summary judgment as a matter of law on the issue of liability, in that Defendants were obligated under the Letter Agreement to designate Plaintiffs as a co-broker on the surety bonds at issue in order to be compensated and failed to do so. Accordingly, Plaintiffs' Motion for Partial Summary Judgment[88] is **GRANTED** as to liability on the part of Defendants, but the Motion is **DENIED** on the issue of whether Defendants acted in bad faith.

**New Orleans, Louisiana**, on this   31st   day of March, 2020.

_____
**GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE**

---

[87] R. Doc. 57.
[88] R. Doc. 59.